UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
KEVIN WILLIAMS, *pro se*,                      :
                                               :
                            Petitioner,        :
                                               :          **OPINION AND ORDER**
            -against-                          :          10-CV-3910 (DLI)
                                               :
MARK BRADT, Superintendent, Elmira             :
Correctional Facility,                         :
                                               :
                            Respondent.        :
                                               :
-------------------------------------------------------- x

**DORA L. IRIZARRY, United States District Judge:**

   *Pro se* Petitioner Kevin Williams ("Petitioner") seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254.  (*See* Pet., Dkt. Entry No. 1).[1]  On November 29, 2005, following a nonjury

trial, the New York State Supreme Court, Queens County ("Queens County Supreme Court"),

entered a judgment convicting Petitioner of Murder in the Second Degree, Criminal Possession

of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree,

and imposing a sentence of 25 years to life imprisonment.  In light of Petitioner's *pro se* status,

the Court liberally construes the Petition, Amended Petition (Am. Pet., Dkt. Entry No. 38), and

supporting memoranda as together raising several claims for habeas relief.[2]  Respondent, through

its counsel Queens County District Attorney, opposes each claim.  For the reasons set forth

below, Petitioner's habeas application is dismissed in its entirety.

---

[1]  In reviewing Petitioner's pleadings, the Court is mindful that, "[a] document filed *pro se* is to be liberally
construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal
pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Accordingly, the Court interprets
Plaintiff's submissions "to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*,
470 F.3d 471, 474 (2d Cir. 2006) (emphasis and citation omitted).

[2]  All citations to the Petition and Amended Petition herein are made using the page numbering assigned by the
Court's Electronic Case Filing system.

**BACKGROUND**

## I.     The Offense

The evidence adduced at trial indicates that on the morning of February 14, 2003, at roughly 7:30 a.m., Petitioner murdered his friend and business partner Shawn Duncan, A.K.A. Shawn O'Neal Douglas ("Douglas"), at Douglas' home in Queens County, New York.  After stabbing Douglas several times in the arms, chest, and neck, Petitioner shot Douglas in the forehead, killing him.  There were no eyewitnesses to the murder.  In late May 2003, Petitioner was arrested for Douglas' murder.

## II.     The Case against Petitioner

At trial, the prosecution presented the testimony of Petitioner's then-wife, Melissa Williams ("Ms. Williams").  According to Ms. Williams, on the morning of Douglas' murder, she awoke shortly after 7:00 a.m. to find that Petitioner was not at the apartment they shared in Brooklyn, New York.  (*See* State Record, Transcript of Petitioner's Oct. 17, 18, 20, 24, 25, 26, 27, 31, and Nov. 1, 2005 Nonjury Trial ("Tr.") 96, 99-100, 125, 131-32.)  Ms. Williams called Petitioner on his cellphone and spoke to him briefly.  (Tr. 99-100, 102, 131-32)  Petitioner returned to the apartment between 9:00 and 10:00 a.m. that morning, immediately retrieved Windex and a roll of paper towels, and exited the apartment.  (Tr. 100-02, 125.)  Petitioner returned 15 to 20 minutes later and went directly into the bathroom, leaving the door slightly ajar.  (Tr. 102-03.)  Smelling bleach, Ms. Williams opened the door and peeked in.  (Tr. 103, 126.)  She saw Petitioner washing a bloody knife in the sink, with a black and silver handgun resting on the countertop.  (Tr. 103-05, 109-10, 126, 130-31.)  Petitioner told Ms. Williams to get out of the bathroom.  (Tr. 104.)  After she did so, Petitioner turned the shower on and proceeded to clean the bathroom.  (Tr. 104, 110-11, 126.)

When Petitioner exited the bathroom, he went directly to a spare room in the apartment that was empty aside from a television and in-wall air conditioning unit ("AC"). (Tr. 112, 126-28.) Ms. Williams heard Petitioner remove the vent on the AC and then replace it again. (Tr. 113.) Petitioner thereafter came into the living room where Ms. Williams was sitting, approached her, and told her that she would have big problems if she did not stay quiet about what she had seen that morning. (Tr. 113-15.) Petitioner warned her that if she said anything, she would go to jail and the state would take her child away. (Tr. 115.) Petitioner then left the apartment again, returning about an hour later. (Tr. 116.) He again approached Ms. Williams and instructed her to say that he had been home all morning if anyone asked about his whereabouts. (Tr. 115-16.) Early the next morning, Ms. Williams heard Petitioner talking on the phone to his cousin, Jonathan Alejandro ("Mr. Alejandro"). (Tr. 116-17.) After the call ended, Petitioner went into the spare room and Ms. Williams again heard him remove the vent on the AC. (Tr. 117.) Petitioner then left the apartment.

Several days later, Ms. Williams accompanied Petitioner on a trip to Florida. When she returned from Florida, she separated from Petitioner and stayed temporarily with an uncle in Queens. (Tr. 120.) On May 29, 2003, Petitioner showed up the uncle's house, looking for Ms. Williams. (Tr. 121). Ms. Williams was frightened because she had not told Petitioner where she was staying. (Tr. 121-22.) She asked her uncle to drive her to the police station, where Ms. Williams spoke to police and ultimately implicated Petitioner in Douglas' murder. (Tr. 122.) In the days that followed, Petitioner repeatedly told Ms. Williams to write a letter admitting that the police coerced her into "saying what [she] did." (Tr. 122-24.) Ms. Williams refused to do so. (Tr. 123-24.)

The prosecution also presented the testimony of Mr. Alejandro. According to Mr.

Alejandro, Petitioner called him sometime around mid-February 2003 and stated that he was having money problems with his "best friend," whom Petitioner had identified as Douglas in previous conversations. (Tr. 209-11.) Petitioner told Mr. Alejandro that he needed to "get" this other person before they "got" him. (Tr. 210-12, 242.) A few days later, Petitioner called Mr. Alejandro and said that he needed a favor. (Tr. 215-16, 229-30, 238.) Petitioner thereafter came to Mr. Alejandro's home in Brooklyn. Once inside, he produced two guns, some boxes of ammunition, and a holster, telling Mr. Alejandro to get rid of them for him. (Tr. 216-17, 229-30, 234, 238-39.) Mr. Alejandro reluctantly agreed, wrapped the items in old clothing, and stashed them in a closet in his apartment. (Tr. 217-19, 243.)

Several days later, Mr. Alejandro received another call from Petitioner, who said that he was in Florida with his wife. (Tr. 219-20.) Petitioner asked Mr. Alejandro if he had disposed of the guns yet. (Tr. 220.) Mr. Alejandro said that he had, even though he actually had not and the guns were still in his closet, untouched. (Tr. 220-21, 223.) After Petitioner returned from Florida, he again met with Mr. Alejandro and asked him whether the guns were gone. (Tr. 221-23.) Mr. Alejandro thereupon asked whether the guns had been used to hurt anyone. (Tr. 221-23.) Petitioner responded that he "had to take [his best friend] out," because otherwise his best friend was "basically going to take him out." (Tr. 222-23.)

On May 30, 2003, police officers came to Mr. Alejandro's home (Tr. 223-24.) After some discussion, Mr. Alejandro allowed the officers into his home and directed them to the guns hidden in his closet. (Tr. 225-27, 248-49.) Detective Drew, one of the detectives present, testified at trial that police recovered two firearms, an ammunition clip, a holster, and two boxes of ammunition from the closet. (Tr. 187-88.) One of the firearms was a 9 millimeter Luger "Ruger" Model 95DC, a black and silver handgun. (Tr. 188, 349.) Ballistics tests introduced

through testimony at trial showed that a cartridge and shell recovered from the scene of Douglas' murder came from the Ruger. (Tr. 347-50.) Tests also confirmed that a bullet recovered from the morgue was fired from the Ruger. (Tr. 350-55.) Investigators attempted to lift fingerprints from the weapon, but were unsuccessful. (Tr. 355-56.) In addition, the prosecution presented DNA evidence taken from a sample of blood recovered from the driver's side sun visor of Petitioner's vehicle, a 1997 Acura, which police had impounded and inspected in connection with their investigation. (Tr. 154-58, 324-30.) A forensic biologist from the New York City Medical Examiner testified that DNA tests matched the blood to Douglas. (Tr. 157-58, 324-30.)

Finally, the prosecution presented the testimony of Detective Cottage, who took Petitioner into custody just after midnight on May 30, 2003 for questioning in connection with Douglas' murder. (Tr. 263.) Petitioner was escorted to an interview room, where Detective Cottage and another office began interrogating him at around 2:00 a.m. (Tr. 265-67.) During the course of that interview, Detective Cottage produced to Petitioner, without comment, a photograph depicting the firearms and other items police had recovered from Mr. Alejandor's closet. (Tr. 270-72.) Seeing the picture, Petitioner sighed and said, "[T]hat bitch . . . she gave me up." (Tr. 272.) Petitioner then rattled off a series of "what ifs," asking "what if he had a knife?" and "what if he attacked me first?" (Tr. 272-73.) The detectives did not respond, except to administer a *Miranda* warning and place Petitioner under arrest. (Tr. 273.)

## III.    Evidentiary Proceedings

### A.    *Huntley* Hearing

Prior to trial, Petitioner moved to suppress the inculpatory statements he made to police. A *Huntley* hearing was held, where Detective Cottage was the sole testifying witness.[3]   (*See*

_____

[3]  A pretrial hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72 (1965), is held to determine the voluntariness of statements made by a defendant to law enforcement officers.

State Record, Transcript of Mar. 10, 2004 *Huntley* Hearing ("H. Tr.")) Detective Cottage testified that he began the interrogation by asking Petitioner for basic "pedigree information," such as his name, residence, and date of birth. (H. Tr. 28-29.) After supplying some of that information, Petitioner asked why he was there. (H. Tr. 29.) Detective Cottage told Petitioner that Douglas' murder was the reason. (*Id.*) Petitioner smiled and shook his head, "almost out of disgust." (*Id.*) The detectives then told Petitioner that if he wanted to write a statement, now was the time to do so. (*Id.*) Petitioner did not respond. (H. Tr. 30.) At that point, Detective Cottage read Petitioner his *Miranda* rights from a form, asking after each right whether Petitioner understood. (H. Tr. 6-7.) Aside from a "smirk," Petitioner gave no verbal response. (H. Tr. 7.) However, after Detective Cottage advised Petitioner that he had the right to consult with an attorney and to remain silent until that time, Petitioner stated, "I'm not speaking unless the district attorney is here." (H. Tr. 8.) Detective Cottage responded that he would try to get in touch with the district attorney. (H. Tr. 31.) Without further interrogation, Petitioner then told the detectives that he was tired and wanted to get some rest. (H. Tr. 8, 32.) The detectives agreed to a break and left Petitioner in the locked interview room. (H. Tr. 9, 32.)

Sixty to ninety minutes later, Detective Cottage and his partner returned to the interview room. (H. Tr. 33.) Petitioner was awake and sitting up. (*Id.*) Without re-administering *Miranda* warnings, Detective Cottage began talking about Douglas and asked Petitioner to elaborate on their relationship. (H. Tr. 10, 34.) Petitioner responded, telling the detectives about his friendship with Douglas and how one had even been the best man at the other's wedding. (H. Tr. 11, 35.) During the course of the conversation, another detective knocked on the door. Detective Cottage briefly exited the room, returning moments later with a photograph in hand. (H. Tr. 12.) Petitioner asked the detective what it was. (*Id.*) Without comment, Detective

Cottage placed it on the table in front of Petitioner. (*Id.*) The photograph portrayed the items police had recovered from Mr. Alejandro's closet, including the black and silver handgun later confirmed to be the murder weapon. (*Id.*) Seeing the photograph, Petitioner sighed and said, "[T]hat bitch . . . she gave me up, she is the only one I told the story to." (H. Tr. 13, 38-39.) Petitioner did not specifically name his wife. (H. Tr. 39.) He then rattled off questions posed as "what ifs," asking "what if he had a knife?" and "what if he had a gun, or attacked me first?" (H. Tr. 12-13, 39.)

Detective Cottage thereupon suggested that Petitioner "maybe want[ed] to write down a statement," and administered *Miranda* warnings again. (H. Tr. 13.) Petitioner declined, and reiterated that he wanted to speak to the district attorney. (H. Tr. 14, 40.) Petitioner stated that the district attorney needed to be there because the detectives could not "cut him a deal." (H. Tr. 15.) At that point, the detectives left the interview room and contacted the district attorney, who indicated that he was not coming to the police station. (H. Tr. 15, 40.) The detectives returned to the interview room and placed Petitioner under arrest without further interrogation. (H. Tr. 15-16.)

By order dated August 2, 2004, the motion court denied Petitioner's motion to suppress, finding that he had never unequivocally invoked his right to silence or to an attorney. (*See* Dec. & Order of Queens Cnty. Sup Ct., dated Aug. 2, 2004, at 4, Dkt. Entry No. 53.)

### B.     Marital Privilege Hearing

During the course of trial, the court adjourned proceedings to hold a marital privilege hearing. In connection with that hearing, the hearing court took testimony from Ms. Williams (*see* State Record, Transcript of Oct. 20, 2005 Marital Privilege Hearing ("M. Tr.") 2-50), considered briefing by the parties pursuant to a request by Petitioner's trial counsel (*see* M. Tr.

47-48), and heard argument (*see* State Record, Transcript of Oct. 24, 2005 Argument on Marital Privilege ("M2 Tr.") 2-50). Ruling on the record at argument, the hearing court found that a verbal confession Petitioner made to Ms. Williams, admitting to Douglas' murder, was covered by the marital privilege and inadmissible. (M2 Tr. 22-23.) However, the court found that four items fell outside the privilege and were admissible at trial: (1) Ms. Williams' observations of Petitioner's activities in the bathroom on February 14, 2003 (M2 Tr. 13-14); (2) Petitioner's uttered threats against Ms. Williams (M2 Tr. 33, 40-41); (3) Ms. Williams' observations concerning Petitioner's activities in the spare room, removing the AC vent (M2 Tr. 36-37, 40); and (4) Petitioner's requests to Ms. Williams to write a letter saying that her statements to police were coerced (M2 Tr. 44.) In addition, the defense conceded that any telephone conversations between Petitioner and a third party, which Ms. Williams overheard, were admissible. (M2 31, 43-44.)

## IV.    The Trial and Verdict

On the foregoing facts and evidence, Petitioner was tried in a nonjury trial in Queens County Supreme Court. On November 1, 2005, the court rendered its verdict, finding Petitioner guilty of Murder in the Second Degree (N.Y. Penal Law § 125.25(1)), Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03(2)), and Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02(4)). (Tr. 417.) On November 29, 2005, Petitioner was sentenced to an indeterminate prison term of 25 years to life. (State Record, Transcript of Nov. 29, 2005 Sentencing ("S. Tr.") 13-14.)

## V.    Direct Appeals

On appeal to the New York State Supreme Court Appellate Division, Second Department ("Appellate Division"), Petitioner argued that: (1) it was error to admit the inculpatory

statements Petitioner made to police because he had invoked his right to remain silent; (2) it was error to admit Ms. Williams' testimony concerning Petitioner's statements and conduct in the marital home, which properly were subject to the marital privilege; and (3) Petitioner's sentence was excessive. (*See* State Record, Br. for Def.-App., Second Department, Dkt. No. 05-11980.) On September 16, 2008, the Appellate Division affirmed Petitioner's judgment of conviction. *People v. Williams*, 54 A.D.3d 886 (2d Dep't 2008). Petitioner thereafter sought review from the New York State Court of Appeals ("Court of Appeals") with respect to the first two issues raised to the Appellate Division. (*See* State Record, Letter of Harold Ferguson, dated Nov. 5, 2008.) On December 17, 2008, the Court of Appeals denied Petitioner's application for leave to appeal. *People v. Williams*, 11 N.Y.3d 901 (2008).

## VI. Petitioner's § 440.10 Motion

On November 17, 2009, Petitioner moved to vacate his conviction pursuant to New York State C.P.L. § 440.10 ("§ 440.10"), arguing that: (1) the prosecution withheld an exculpatory police report (the "DD-5 Report") containing statements made by April Prince, the upstairs neighbor of Douglas who made the 911 call leading to the discovery of his body; (2) the prosecution committed misconduct during summation by bolstering the testimony of Ms. Williams and Mr. Alejandro, and by impermissibly implying that the burden of proof rested with Petitioner; and (3) evidence of the firearms recovered from Mr. Alejandro's closet was admitted without proper foundation, absent a sufficient basis to link Petitioner to those weapons. (*See* State Record, Petitioner's Aff. in Support of § 440.10 Mot.) In addition, Petitioner argued that he received ineffective assistance from his trial counsel because counsel: (1) failed to adequately investigate the facts underlying the prosecution's theory of the crime, particularly with respect to the statements Ms. Prince made to police; (2) failed to adequately investigate and challenge the

prosecution's timeline of the crime; and (3) failed to raise a *Payton* challenge to Petitioner's allegedly unlawful arrest inside his home.[4]  (*See Id.*)

On March 12, 2010, the Queens County Supreme Court denied Petitioner's § 440.10 motion, ruling that its first three claims all were procedurally defaulted because Petitioner was required to raise them on direct appeal, but did not.  (*See* State Record, Dec. & Order of Queens Cnty. Sup. Ct., dated Mar. 12, 2010, at 2.)  Similarly, the court found that Petitioner's ineffective assistance claim was procedurally defaulted to the extent it was based on counsel's failure to raise a *Payton* challenge.  (*Id.*)  Finally, the court denied the remaining grounds for Petitioner's ineffective assistance claim on the merits.  (*Id.* at 3.)  Petitioner subsequently sought leave to appeal.  On July 14, 2010, the Appellate Division denied Petitioner's application.  (*See* State Record, Dec. & Order of the App. Div., dated July 14`, 2010.)

## VII.    The Instant Proceeding

### A.    The Petition and Memorandum in Support

On August 23, 2010, Petitioner filed the Petition in this matter, asserting four grounds for habeas relief: (1) Petitioner received ineffective assistance from his trial counsel because counsel (*i*) failed to sufficiently investigate the facts underlying the prosecution's theory and timeline of the crime, (*ii*) failed to adequately use a record (the "911 Sprint Sheet") of Ms. Prince's 911 call to argue that Douglas' murder occurred after 9:00 a.m., around the same time Petitioner supposedly returned home to his apartment in Brooklyn according to Ms. Williams' testimony, and (*iii*) failed to adequately investigate and challenge Mr. Alejandro's statements to police indicating that Petitioner had given him the firearms and other evidence recovered from his closet; (2) Petitioner was deprived of a fair trial because the prosecution knew that he was

---

[4]    A challenge pursuant to *Payton v. New York*, 445 U.S. 573 (1980), alleges that police unlawfully made a warrantless and non-consensual entry into a defendant's home to make a routine felony arrest, absent exigent circumstances.

actually innocent of Douglas' murder, but continued to maliciously prosecute him using false testimony from Ms. Williams; (3) the prosecution failed to show that the guns recovered from Mr. Alejandro's closet actually belonged to Petitioner, since they were found in Mr. Alejandro's possession without any nexus to Petitioner aside from Mr. Alejandro's uncorroborated statements; and (4) the police violated Petitioner's *Payton* rights when they arrested him inside his home, and failed to administer *Miranda* warnings when they subsequently questioned him at the police station. (*See generally* Pet.)

On October 25, 2010, Respondent filed an Opposition to the Petition. (*See* Opp'n to Pet., Dkt. Entry No. 8.) Thereafter, on November 29, 2010, Petitioner submitted a memorandum in further support of the Petition (Petitioner's "Memorandum in Support"), which purported to assert three additional grounds for relief: (1) the inculpatory statements Petitioner made during interrogation should have been suppressed because the police violated his right to remain silent after he invoked it; (2) certain portions of Ms. Williams' testimony were admitted improperly in violation of the marital privilege; and (3) his sentence was excessive. (*See* Pet.'s Mem. in Supp. of Pet., dated Nov. 29, 2010 ("Pet. Mem."), Dkt. Entry No. 11.)

### B. Petitioner's *Coram Nobis* Application

On February 22, 2011, while the Petition was pending before this Court, Petitioner filed an application in the Appellate Division seeking a writ of error *coram nobis*. Therein, Petitioner asserted a claim that he received ineffective assistance from his appellate counsel because counsel failed to raise the following issues on appeal: (1) Petitioner's waiver of the right to a jury trial was jurisdictionally defective and was not made knowingly, voluntarily, and intelligently; (2) the evidence at trial was legally insufficient to support Petitioner's conviction; and (3) Petitioner was deprived of a *Mapp/Dunaway* hearing due to trial counsel's

ineffectiveness.[5]  (*See* Pet.'s Mem. in Supp. of Error *Coram Nobis* Relief, dated Feb. 22, 2011,

Dkt. Entry No. 42-1.)   The Appellate Division denied Petitioner's *coram nobis* petition on

October 18, 2011, and the Court of Appeals subsequently denied leave to appeal.   (*See* State

Record, Dec. & Order of App. Div., dated Oct. 18, 2011; Order Denying Leave, dated Jan. 19,

2012.)

### C.      Petitioner's § 440.30 Motion

On June 30, 2011, while the Petition still was pending, Petitioner filed a motion pursuant

to New York State C.P.L. § 440.30 ("§ 440.30") seeking to compel DNA testing of Douglas'

bloodied clothing.   (*See* Pet.'s Notice of § 440.30 Mot., dated June 30, 2011, Dkt. Entry No. 42-

2.)  On September 30, 2011, the Queens County Supreme Court denied Petitioner's motion.  (*See*

State Record, Dec. & Order of Queens Cnty. Sup. Ct., dated Sept. 30, 2011.)   The Appellate

Division affirmed that denial on March 19, 2014, (*see* State Record, Dec. & Order of App. Div,

dated March 19, 2014), and Petitioner's application for leave to appeal to the Court of Appeals

subsequently was denied on July 28, 2014.

### D.      The Amended Petition

By Order dated October 14, 2014, the Court granted Petitioner leave to amend the

Petition to include the claims he had exhausted in state court.   (*See* Order dated Oct. 14, 2014.)

On December 18, 2014, Petitioner filed an Amended Petition which reasserted the same grounds

for relief articulated in the Petition, but also included two new grounds: (1) he received

ineffective assistance of appellate counsel because counsel failed to raise on direct appeal that

Petitioner's waiver of the right to a jury trial was jurisdictionally defective, and also failed to

argue that such waiver was not made knowingly, voluntarily, and intelligently; and (2) the

---

[5]   A hearing pursuant to *Mapp v. Ohio*, 367 U.S. 643 (1961), and *Dunaway v. New York*, 442 U.S. 200 (1979),
addresses whether evidence that allegedly was obtained unlawfully should be suppressed at a subsequent trial.

motion court erred in denying Petitioner's application for DNA testing. (*See* Am. Pet. at 7-9.) The Amended Petition also includes a demand for "relief on procedural grounds," based on a claim of Petitioner's actual innocence. (*Id.* at 9-12.)

## DISCUSSION

For clarity, the Court begins by identifying the claims it construes the Petition, the Memorandum in Support, and the Amended Petition to raise. In the original Petition, Petitioner asserts the following claims: (1) ineffective assistance of trial counsel; (2) prosecutorial misconduct; (3) the prosecution failed to establish that the murder weapon belonged to Petitioner/insufficiency of the evidence; (4) *Payton* violation; and (5) failure to administer a *Miranda* warning. In the Memorandum in Support, Petitioner further asserts claims that: (6) his right to remain silent was violated; (7) certain testimony of Ms. Williams covered by the marital privilege should have been excluded; and (8) his sentence was excessive. Finally, in the Amended Petition, Petitioner reasserts the claims in the original Petition and also alleges claims of: (9) ineffective assistance of appellate counsel; and (10) improper denial of post-conviction DNA testing.[6] Liberally construed, the Amended Petition also asserts a claim that any procedural bar to habeas review should be excused due to Petitioner's actual innocence.

## I.    Timeliness Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes a one-year period of limitations for a state prisoner to file a claim for habeas relief pursuant to 28 U.S.C. § 2254. Respondent contends that the claims asserted by Petitioner in the Memorandum in Support and in the Amended Petition are time-

---

[6] The grounds for relief alleged in the Petition are reasserted in the Amended Petition, in substance the same but sometimes articulated slightly differently. Given Petitioner's *pro se* status, the Court construes those filings together to "raise the strongest arguments that they suggest." *Triestman*, 470 F.3d at 474 (emphasis and citation omitted.)

barred. The Court agrees in part. Claims 7, 8, and 9 are dismissed as untimely. However, claims 6 and 10 are deemed timely by reason of relating back to the timely filed Petition.

## A. Legal Standard

AEDPA provides that a one-year limitations period "shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). Under AEDPA, the limitations period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.*

Thus, a timely basis for an otherwise untimely claim may be established where new facts or evidence have been uncovered. § 2244(d)(1)(D); *see McQuiggin v. Perkins*, 133 S. Ct. 1924, 1932-33 (2013). However, "when evidence is newly obtained, but could have been obtained earlier [through the exercise of due diligence], the date when the evidence was actually obtained has no effect on the AEDPA limitation period." *Adams v. Greiner*, 272 F. Supp. 2d 269, 274 (S.D.N.Y. 2003) (alteration in original) (citation omitted). In addition, an otherwise untimely claim may be deemed timely if the court finds that there is a basis for equitable tolling of the limitations period. *See Holland v. Florida*, 560 U.S. 631, 645 (2010). "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2)

that some extraordinary circumstance stood in his way and prevented timely filing." *Id*. at 649

(quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)) (internal quotation marks omitted.)

Barring the above exceptions, a timely petition may not be amended to include new claims after AEDPA's limitations period has expired, unless the newly asserted claims "relate back" to the original petition. A claim relates back where it "arose out of the [same] conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B) (as made applicable to habeas proceedings pursuant to 28 U.S.C. § 2242); *see also Ozsusamlar v. United States*, 2013 WL 4623648, at *3 (S.D.N.Y. Aug. 29, 2013). In *Mayle v. Felix*, 545 U.S. 644, 650 (2005), the Supreme Court examined relation back in the habeas context, explaining: "An amended habeas petition . . . does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Thus, a new claim will not relate back merely because it arose from the same "trial, conviction, or sentence" as a timely filed claim. *Id.* at 662-64. Rather, relation back is permitted only insofar "as the original and amended petitions state claims that are tied to a common core of operative facts." *Id.* at 664.

B.      **Expiration of the Limitations Period**

As indicated in *Mayle*, a claim omitted from a habeas petition that later is raised during the course of proceedings is deemed filed as of the date the claim first was made. Here, the claims raised for the first time in the Memorandum in Support and in the Amended Petition were raised after AEDPA's one-year limitations period expired, as the following illustrates.

Petitioner's conviction became final on March 17, 2009, ninety days after the New York Court of Appeals' December 17, 2008 denial of Petitioner's application for leave to appeal from the order of the Appellate Division affirming his judgment of conviction. *See Williams v. Artuz*,

237 F.3d 147, 150 (2d Cir. 2001) (a conviction becomes final for purposes of AEDPA when the petitioner's direct appeal to the highest state court has concluded, and the time to seek a writ of *certiorari* with the Supreme Court of the United States has expired.)  Pursuant to 28 U.S.C. § 2244(d)(2), a properly filed application for state post-conviction relief will toll the limitations period.  Petitioner made no such motion until he filed his § 440.10 motion on November 17, 2009, exactly 245 days after his conviction became final.  AEDPA's limitations period was tolled from that point until Petitioner's motion finally was resolved on July 14, 2010, when the Appellate Division denied Petitioner's application for leave to appeal.[7]  Another 34 days elapsed before the Petition in this matter was filed on August 17, 2010.  At that point, 86 days remained of AEDPA's limitations period.  Therefore, that period expired on November 11, 2010, well before Petitioner filed his application for *coram nobis* relief in state court on February 22, 2011.  As such, Petitioner's Memorandum in Support, dated November 18, 2010, and the Amended Petition, dated December 1, 2014, both were filed after AEDPA's limitations expired.[8]  It follows that the claims raised for the first time in those filings are time-barred under AEDPA unless Petitioner can show that some exception applies.

---

[7]  Following the Appellate Division's denial of leave, Plaintiff sought leave to appeal to the Court of Appeals. Because New York law does not recognize the availability of such an application, Petitioner's application was not a "properly filed" application for purposes of tolling the limitations period under 28 U.S.C. § 2244(d)(2).

[8]  The Court measures from the dates that Petitioner affixed on his filings, rather than the dates those filings were received by the Court, as "a prisoner's filing . . . is deemed to occur not when the petition is docketed in court, but when he gives it to prison authorities for mailing."  *Bostic v. Greiner*, 2003 WL 22670908, at *3 (E.D.N.Y. Oct. 31, 2003) (citing *Houston v. Lack*, 487 U.S. 266 (1988)).  The Court also notes that the record of this proceeding reflects a discrepancy.  On January 14, 2011, Petitioner moved to stay proceedings to exhaust additional claims in state court.  (Dkt. Entry No. 14.)  By Order dated February 8, 2011, the Court denied Petitioner's stay application.  (Dkt. Entry No. 21.)  It also denied Petitioner's subsequent request for reconsideration.  (*See* Electronic Order, dated January 24, 2012.)  After Petitioner exhausted his additional claims, the Court entered an Order granting Petitioner leave to amend the Petition.  In that Order, whether by inadvertence or oversight, the Court indicated that it was lifting the stay when, in fact, it had not granted a stay in the first place.  (*See* Electronic Order, dated October 16, 2014.)  Notably, this discrepancy has no impact on whether the claims in Petitioner's Memorandum in Support and in the Amended Petition were timely asserted.  As demonstrated above, AEDPA's limitations period expired with respect to both of those filings well before Petitioner moved for a stay in January 2011.

### C. Claim 6, Alleging a Violation of the Right to Remain Silent, Relates Back

The Memorandum in Support alleges that the inculpatory statements Petitioner made to police should have been suppressed, as those statements purportedly were elicited in violation of Petitioner's right to remain silent. (*See* Pet. Mem. at 11-12.) That claim is distinguishable from the *Miranda* claim asserted in the original Petition, which alleges that police never advised Petitioner of his rights during the course of interrogation. (*See* Pet. at 29-31.) Nevertheless, those claims are bound together by a common core of operative facts and support a finding of relation back. Accordingly, the Court considers the merits of the two claims together in Section III of this Opinion, *infra*.

### D. Claim 7, Alleging Error in the Marital Privilege Ruling, Is Untimely

The Memorandum in Support further alleges that certain portions of Ms. Williams' testimony improperly were admitted at trial in violation of the state marital privilege. (*See* Pet. Mem. at 12.) As an initial matter, all of the facts and evidence necessary to assert that claim were known to Petitioner at the time his conviction became final, and he does not allege any ground for equitable tolling. As such, there is no basis to find that the applicable limitations period was delayed in triggering or subject to tolling for equitable reasons. It follows that Petitioner's claim is time-barred under AEDPA unless it relates back to the original Petition.[9]

It does not. While Petitioner generally questions the veracity of Ms. Williams' testimony in the Petition, he does not suggest that her testimony violated the marital privilege or any other duty of confidence. Rather, he simply alleges that aspects of her testimony were false, which is a claim based on facts different in "both time and type" from his newly asserted claim challenging

---

[9] A substantive claim that is time-barred under AEDPA still may be considered by the court upon a petitioner's showing of actual innocence. Here, the Court addresses Petitioner's actual innocence argument in Section I.H of this Opinion, *infra*, and finds it unavailing.

the state court's marital privilege ruling.  *Mayle*, 545 U.S. at 650.  Accordingly, Petitioner's marital privilege claim does not relate back to the Petition and is dismissed as untimely.[10]

### E.    Claim 8, Alleging that Petitioner's Sentence Was Excessive, Is Untimely

The Memorandum in Support further alleges that Petitioner's sentence of 25 years to life was excessive.  (*See* Pet. Mem. at 13-15.)  That claim is not based on new facts or evidence, and there is no basis for equitable tolling.  Accordingly, Petitioner's excessive sentence claim is timely only if it relates back.  It does not.  All of the claims in the Petition challenge rulings or conduct during trial and pretrial proceedings, rather than matters relating to or otherwise contemporaneous with the imposition of Petitioner's sentence.  Therefore, Petitioner's excessive sentence claim, being factually distinct in "both time and type" from the claims in the original Petition, does not relate back to those claims.  *Mayle*, 545 U.S. at 650.  Accordingly, Petitioner's excessive sentence claim is dismissed as untimely.[11]

### F.    Claim 9, Alleging Ineffective Assistance of Appellate Counsel, Is Untimely

The Amended Petition alleges that Petitioner's appellate counsel was ineffective because he failed to challenge the validity and voluntariness of Petitioner's waiver of a jury trial.  (*See* Am. Pet. at 7-8.)  That claim is not based on new facts or evidence, and there is no basis for equitable tolling.  Therefore, Petitioner's ineffective assistance claim is untimely unless it relates to back to the claims in the original Petition.  Judged against those claims, it does not.  From a

---

[10]   Even if Petitioner's marital privilege claim were timely and otherwise reviewable by the Court, it would not warrant habeas relief.  Evidentiary rulings are a matter of state law generally not subject to federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  They are cognizable as a basis for habeas relief only where the ruling rose to a violation of due process that "deprived [the petitioner] of a fundamentally fair trial."  *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988)) (emphasis omitted).  Here, Petitioner has not shown that the hearing court's marital privilege ruling was an error of state law, let alone a due process violation that rendered his trial fundamentally unfair.

[11]   Even if Petitioner's excessive sentence claim were timely and otherwise reviewable by the Court, it would not warrant habeas relief.  Where, as here, a petitioner's sentence was within the range prescribed by state law, a claim that such sentence was excessive is not cognizable on federal habeas review.  *See Taylor v. Connelly*, 18 F. Supp. 3d 242, 268 (E.D.N.Y. 2014).

temporal perspective, it relates to a perceived constitutional deprivation during the appeals process, an entirely different stage of the criminal proceeding than the pretrial and trial stages that are the focus of the claims in the original Petition. Moreover, the Petition does not challenge the fact of Petitioner's jury waiver. *See Wager v. Ercole*, 2009 WL 1659741, at *2-3 (S.D.N.Y. June 12, 2009) (ineffective assistance of appellate counsel claim did not relate back to original petition where that petition did not "raise any claim concerning the facts underlying the new claim of ineffective assistance.") Therefore, Petitioner's claim of ineffective assistance of appellate counsel does not relate back to the claims in the original Petition, as it is premised on facts distinct in "both time and type" from those underlying the original claims. *Mayle*, 545 U.S. at 650. That conclusion is compelled even though the original Petition asserts a claim for ineffective assistance of trial counsel. That claim relates to trial counsel's purported failure to challenge the prosecution's theory of the case, whereas Petitioner's claim in the Amended Petition is that appellate counsel failed to challenge the validity of Petitioner's jury waiver. Thus, the two claims differ in substance irrespective of the fact that they both are labeled as ineffective assistance claims. *See Jenkins v. Graham*, 2009 1119383, at *3 (S.D.N.Y. Apr. 23, 2009). Accordingly, Petitioner's claim of ineffective assistance of appellate counsel is dismissed as untimely.

### G.    Claim 10, Regarding DNA Testing, Is Assumed To Relate Back

The question of timeliness is thornier with respect to the Amended Petition's claim that the state court erred in denying Petitioner's § 440.30 motion to compel DNA testing. (*See* Am. Pet. at 8-9.) Petitioner certainly could argue that the factual predicates for that claim were not discoverable until less than a year before the filing of the Amended Petition, as his § 440.30 motion was not fully adjudicated in the state courts until July 28, 2014. Even if untimely under

that calculation, Petitioner still could argue that his claim relates back to the claims in the original Petition, for example by expanding on his original claim that the state maliciously prosecuted him despite knowing of his innocence. *See Bryant v. Greiner*, 2006 WL 1675938, at *2 (S.D.N.Y. June 15, 2006) (petitioner's claim that he was denied access to DNA evidence related back to original claim that his conviction violated due process.)

On the other hand, Petitioner arguably could have discovered the factual predicates for his claim at an earlier time. All the facts Petitioner relied upon to bring his § 440.30 motion were known to him when he made his initial § 440.10 motion in November 2009, if not at an earlier time, and yet Petitioner did not file his DNA testing motion until June 2011. Furthermore, Petitioner's claim arguably does not relate back to the claims in the original Petition, none of which concerned crime scene evidence. *See Newton v. Coombe*, 2001 WL 799846, at *9 (S.D.N.Y. July 13, 2001) (claim based on newly discovered DNA evidence was an "entirely different claim from any that was raised in the original petition.") Under the circumstances here, rather than wading through a procedural morass, the Court thinks it appropriate to cut straight to the merits of Petitioner's claim on the assumption that it relates back to the timely filed Petition. *See Id.* at *10. Accordingly, the Court considers the merits of Petitioner's DNA testing claim in Section III of this Opinion, *infra*.

### H.     Petitioner's Actual Innocence Claim Is Unavailing

Where, as here, substantive claims for habeas relief are time barred, a petitioner's claim that he is actually innocent can serve as a means to overcome that bar and permit a court's consideration of the substantive grounds for relief alleged. *See Schlup v. Delo,* 513 U.S. 298, 315 (1995); *Rivas v. Fischer,* 687 F.3d 514, 540 (2d Cir. 2012). Thus, an assertion of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas

petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)) (internal quotation marks omitted). A successful claim of actual innocence, *i.e.* one that will serve as a "gateway" for the court to consider accompanying constitutional claims, must be both "credible" and "compelling." *House v. Bell*, 547 U.S. 518, 521 (2006). For the claim to be "credible," it must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. For the claim to be "compelling," the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. While not requiring "absolute certainty about the petitioner's guilt or innocence," the preceding standards have been characterized as "demanding." *Id.*

Here, Petitioner's claim of actual innocence is premised on a challenge to the timeline of Douglas' murder, which occurred at Douglas' home in Queens at approximately 7:30 a.m. according to the prosecution. Petitioner alleges that new evidence suggests that the murder actually occurred after 9:00 a.m., a fact that purportedly would provide Petitioner with an alibi because Ms. Williams testified at trial that Petitioner returned home to their Brooklyn apartment around the same time.[12] (*See* Am. Pet. at 9-12.) To establish this later timeline, Petitioner relies upon two pieces of evidence: (1) the DD-5 Report memorializing a police detective's interview of Ms. Prince, the neighbor whose 911 call led police to discover Douglas' body; and (2) the 911

---

[12] In support of his argument, Petitioner repeatedly characterizes Ms. Williams' testimony as placing him at their Brooklyn apartment at 9:00 a.m. on the morning of Douglas' murder. In fact, Ms. Williams' testimony at trial was that Petitioner returned to the apartment between 9:00 and 10:00. (Tr. 100-02.) When asked on cross-examination how long after 9:00 Petitioner returned, Ms. Williams could not recall.

Sprint Sheet, a record of Ms. Prince's 911 call.

As an initial matter, it is an open question in this Circuit whether evidence, to qualify as "new" for purposes of an actual innocence claim, must have been unavailable at the time of trial, or simply not presented to the trier of fact at trial. *See Read v. Superintendent Mr. Thompson*, 2016 WL 165716, at *7 (S.D.N.Y. Jan. 13, 2016.) Here, the evidence Petitioner relies upon was not placed on the record at trial, but evidently was available at that time to Ms. D'Elia, his trial counsel. (*See* Ex. F to the Am. Pet., Aff. Of Anne J. D'Elia, dated February 8, 2010 ("D'Elia Aff.") ¶ 4; *see also* Pet. at 17.) Nevertheless, the Court need not resolve the question of whether Petitioner has put forth "new" evidence, as the records he relies upon do not support a credible or compelling claim of actual innocence.

As reflected in the DD-5 Report, Ms. Prince was interviewed by a police detective on the day of Douglas' murder and reported as follows: (1) at 7:40 a.m. she heard the victim's radio alarm go off; (2) "some time" passed; and (3) then she heard "scuffling, banging around, and then muffled screams," followed by "footsteps again running out of the house." (Ex. A to the Am. Pet.) Thus, the DD-5 Report does not contain any facts conclusively substantiating Petitioner's alternate timeline of Douglas' murder. Petitioner argues that the time between when Ms. Prince first heard the victim's radio alarm, and when she later heard a scuffle, must have been substantial. However, that contention is based purely on Petitioner's speculation that "[a] lot of events" must have taken place in that intervening time. (*See* Am. Pet. at 10.) Petitioner does not even identify these purported events, except to suggest that Ms. Prince took her son to school and returned home before hearing the commotion in Douglas' apartment. (*See Id.* at 11.) Yet, the DD-5 Report directly contradicts that account, as it clearly states that Ms. Prince never left her apartment the morning of Douglas' murder. (Ex. A to the Am. Pet.) Moreover, in

affidavits submitted in connection with Petitioner's § 440.10 motion, both Ms. D'Elia and the lead prosecutor for the state, Mr. Kosinski, attested that Ms. Prince's testimony at trial—had she been called—would not have supported a time of death consistent with Petitioner's alternate timeline. Much the opposite, Ms. D'Elia concluded that Ms. Prince's testimony would have "destroy[ed]" any such timeline. (D'Elia Aff. ¶ 4.) Mr. Kosinski similarly concluded that Ms. Prince's testimony would have established a "far earlier time of death" than 9:00 a.m. (State Record, Aff. of John Kosinski, dated Feb. 16, 2010 ("Kosinski Aff.") ¶ 14.)

The 911 Sprint Sheet is equally inconclusive as to the actual time of Douglas' murder. While certain records pertaining to Ms. Prince's 911 call can be found elsewhere in the record, (*see, e.g.,* Ex. 1A to Pet. Mem., Dkt. Entry No. 11-2), the Amended Petition attaches only a handwritten transcription purportedly memorializing Ms. Prince's exchange with the 911 operator. (*See* Ex. C to the Am. Pet.) Even assuming the legitimacy and accuracy of that questionable submission, it hardly confirms Petitioner's alternate timeline. At most, it indicates that Ms. Prince called 911 at approximately 9:40 a.m., reporting to the operator that she heard a commotion in Douglas' apartment "um . . . maybe . . . 20 to 30 minutes ago." (*Id.*) That single, vague statement, presented to the Court in an unverified handwritten transcription, is not sufficiently credible or compelling to sustain a gateway claim of actual innocence. Indeed, it directly conflicts with other statements Ms. Prince made to police. Moreover, while the prosecution made a strategic decision not to introduce Petitioner's cellphone records at trial, Ms. D'Elia and Mr. Kosinski both acknowledge that those records placed Petitioner in the immediate vicinity of the crime scene at 7:35 a.m. on the morning of Douglas' murder. (D'Elia Aff. ¶ 4.) Petitioner provides no explanation for that fact.

Finally, while not credible or compelling on its own, the evidence Petitioner relies upon

is even more inadequate when judged against the substantial proof offered by the prosecution at trial. Among other evidence, the prosecution introduced: (1) testimony from both Ms. Williams and Mr. Alejandro implicating Petitioner; (2) the murder weapon, along with testimony tying it to Petitioner; (3) Petitioner's own inculpatory statements; and (4) blood evidence from Petitioner's car matching the victim. Weighed against the foregoing, the scant and unreliable evidence Petitioner presents in support of his actual innocence claim does not support a probability that, in light of such evidence, any rational juror would have a reasonable doubt as to Petitioner's guilt. *See Rivas*, 687 F.3d at 541-42 ("The [*Schlup*] standard therefore requires reviewing courts to consider all the evidence, old and new, incriminating and exculpatory, and, viewing the record as a whole, to make a probabilistic determination about what reasonable, properly instructed jurors would do.") (quoting *House*, 547 U.S. at 538) (internal quotation marks omitted). Accordingly, Petitioner has not sufficiently demonstrated "actual innocence" to overcome AEDPA's time bar.

## II. Procedural Bars to Habeas Review

Respondent contends that a number of Petitioner's claims are procedurally barred from habeas review. The Court agrees to the extent it concludes that Claims 3 and 4 are procedurally barred on independent and adequate state grounds. Claim 2, while unexhausted, is deemed exhausted, but procedurally barred.

### A. Legal Standard: The "Independent and Adequate State Grounds" Bar

Federal courts "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Kozlowski v. Hulihan,* 511 F. App'x 21, 23 (2d Cir. 2013) (quotations marks and citations omitted). A state ground is "independent" if it "fairly

appears to rest primarily on state law." *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006)

(quoting *Coleman v. Thompson*, 501 U.S. 722, 740 (1991)) (emphasis and internal quotation

marks omitted).  A ground is "adequate only if it is based on a rule that is firmly established and

regularly followed by the state in question." *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003)

(quoting *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)).  However, there are "exceptional

cases in which exorbitant application of a generally sound rule renders the state ground

inadequate to stop consideration of a federal question." *Id.* at 240 (quoting *Lee v. Kemna*, 534

U.S. 362, 376 (2002)).  In determining whether a case is "exceptional," such that the state ground

should be held inadequate, the Second Circuit uses three factors as guideposts:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and
> whether perfect compliance with the state rule would have changed the trial court's
> decision; (2) whether state caselaw indicated that compliance with the rule was demanded
> in the specific circumstances presented; and (3) whether petitioner had "substantially
> complied" with the rule given "the realities of trial," and, therefore, whether demanding
> perfect compliance with the rule would serve a legitimate governmental interest.

*Id.* (internal quotation marks and citation omitted.)  A decision that a state procedural rule is

inadequate should not be made "lightly or without clear support in state law." *Garcia*, 188 F.3d

at 77 (citation omitted).

A finding of procedural default based on independent and adequate state grounds

precludes federal habeas review of a claim, "unless the habeas petitioner can show cause for the

default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim

will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989)

(internal quotation marks and citations omitted.)

### 1. Claim 3, Regarding Evidence of the Murder Weapon, Is Procedurally Barred

The Petition alleges that the prosecution never established that Petitioner exercised

"dominion or control" over the two guns recovered from Mr. Alejandro's closet, one of which

was presented at trial as the murder weapon. (*See* Pet. at 8, 27.) In the Amended Petition, Petitioner further contends that Mr. Alejandro's testimony was insufficient to tie him to those firearms, particularly because there was no pretrial hearing or corroborating evidence to verify that testimony. (*See* Am. Pet. at 5-6.) Invoking his due process right to a fair trial, Petitioner presented essentially the same claim to the state courts in his § 440.10 motion. He expressly argued in support of that motion that "no proper evidentiary foundation was laid for [the gun's] admission since no evidence was presented that the defendant ever had constructive possession of the firearms, but for the uncorroborated allegations of Mr. Alejandro." (*See* State Record, Pet.'s Aff. in Supp. of § 440.10 Mot., at 10-11.)

In its order denying Petitioner's motion, the Queens County Supreme Court ruled that Petitioner's claim was procedurally defaulted under state law. Specifically, the court ruled that New York State C.P.L. § 440.10(2)(c) ("§ 440.10(2)(c)") precluded review, as Petitioner unjustifiably failed to raise that issue on direct appeal despite the fact that there were sufficient facts in the record to do so.[13] (*See* State Record, Dec. & Order of Queens County Sup. Ct. dated Mar. 12, 2010, at 2.) The Appellate Division subsequently denied Petitioner's application for leave to appeal. (*See* State Record, Dec. & Order of the App. Div., dated July 14, 2010.) For present purposes, the state court's decision constitutes an independent and adequate ground precluding this Court's review of Petitioner's claim. It was independent because the state court "relied on no federal law" in reaching its determination that Petitioner failed to comply with a state procedural rule. *Kozlowski*, 511 F. App'x at 25. It was adequate because a review of the

---

[13] New York State C.P.L. § 440.10(2)(c) provides as follows: "[T]he court must deny a motion to vacate a judgment when . . . [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him."

relevant case law confirms that § 440.10(2)(c) is a "firmly established and regularly followed" rule. *Lee*, 534 U.S. at 376; *see also Jones v. Bradt*, 2015 WL 506485, at *4 (W.D.N.Y. Feb. 6, 2015) (In New York, "where the record is sufficient to allow appellate review of a claim, the failure to raise that claim on appeal precludes subsequent collateral review of the claim.") (quoting *Alston v. Donnelly*, 461 F. Supp. 2d 112, 123 (W.D.N.Y. 2006)). Furthermore, this clearly is not an exceptional case where consideration of the guideposts laid out by the Second Circuit in *Cotto v. Herbert*, as noted above, compels a conclusion that the state ground was inadequate. *See Cotto*, 331 F.3d at 239.

Accordingly, Petitioner's claim is barred from review by this Court unless he can show cause for his default and resulting prejudice, or otherwise demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *See Harris*, 489 U.S. at 262. However, Petitioner fails to make the requisite showing. With respect to cause for his default, Petitioner alleges that his appellate counsel considered the issue and decided not raise it on appeal. (*See* Pet. at 8.) As a general rule, advice from counsel not to pursue an issue on appeal is insufficient to demonstrate cause for default unless the petitioner independently can establish a valid claim that counsel's advice was constitutionally deficient. *See Murray v. Carrier*, 477 U.S. 478, 488-89 (1986.) Ordinarily, this entails exhausting an ineffective assistance claim in the state courts before presenting it to the federal habeas court as a cause for default. *Id.*; *see also Lewis v. Griffin*, 2015 WL 6692220, at *7 (N.D.N.Y. Nov. 2, 2015).

Here, although Petitioner alleged in his *coram nobis* application that appellate counsel was ineffective, he did not include as a ground for that claim counsel's failure to challenge the introduction of evidence at trial relating to the firearms recovered from Mr. Alejandro's closet. (*See* Pet.'s Mem. in Supp. of Error *Coram Nobis* Relief, dated Feb. 22, 2011, Dkt. Entry No. 42-

1.)  Nor does Petitioner identify that failure as a basis for relief in connection with the untimely claim of ineffective assistance of appellate counsel he raises in the Amended Petition.  (*See* Am. Pet. at 7-8.)  Finally, there are no other facts or allegations to establish that appellate counsel's advice was constitutionally deficient.  Accordingly, Petitioner fails to show cause for his default, rendering unnecessary any inquiry into whether Petitioner can demonstrate prejudice.

In addition, Petitioner has not shown that the Court's failure to consider his claim will result in a fundamental miscarriage of justice.  To qualify for that exception to procedural default, a petitioner must establish a claim of actual innocence that is both credible and compelling.  *See Rivas*, 687 F.3d at 541-42.  As discussed in Section I.H of this Opinion, *supra*, Petitioner has not done so.  Accordingly, Petitioner's claim that evidence of the murder weapon was insufficient and admitted without foundation is dismissed as procedurally barred.

### 2. Claim 4, Alleging a *Payton* Violation, Is Procedurally Barred

Both the Petition and Amended Petition allege that police unlawfully entered Petitioner's home to arrest him.  (*See* Pet. at 9; Am. Pet. at 6-7.)  Although he framed it in the context of ineffective assistance, Petitioner presented the same claim to the state courts in his § 440.10 motion.  In support of that motion, Petitioner laid out all the facts pertaining to the police entry and argued that it violated his right against unlawful search and seizure.  (*See* State Record, Pet.'s Aff. in Supp. of § 440.10 Mot., at 21-12.)  He further argued that any evidence obtained as a result of the illegal entry should have been suppressed.[14]  (*See Id.*)  In its order denying Petitioner's motion, the Queens County Supreme Court ruled that Petitioner's unlawful arrest claim was procedurally defaulted under § 440.10(2)(c) because Petitioner could have, but did not, raise that claim on direct appeal.  (*See* State Record, Dec. & Order of Queens County Sup.

---

[14]  Notably, Petitioner does not identify any specific evidence that was seized as a result of the allegedly unlawful entry.

Ct. dated Mar. 12, 2010, at 2.)  The court's order made it clear that Petitioner's claim was defaulted whether construed as a standalone claim, or as an ineffective assistance challenge. Petitioner's application for leave to appeal subsequently was denied.

For the reasons discussed with respect to claim 3, *supra*, the state court's decision constitutes an independent and adequate ground precluding review of Petitioner's unlawful arrest claim.  Furthermore, Petitioner fails to demonstrate cause for default.  He alleges that appellate counsel advised him not to pursue the issue on appeal, (*see* Pet. at 10), but again fails to establish that such advice was constitutionally deficient.  Having also failed to demonstrate actual innocence, Plaintiff cannot avail himself of the "fundamental miscarriage of justice" exception to procedural default.  Accordingly, Petitioner's unlawful arrest claim is dismissed as procedurally barred.

### B.      Legal Standard:  Exhaustion

Under 28 U.S.C. § 2254(b), a habeas petition may not be granted unless the petitioner adequately has exhausted available state remedies.  This requirement ensures that a state is given the first opportunity "to pass upon and correct" alleged violations of its prisoners' federal rights. *Jackson v. Edwards*, 404 F.3d 612, 618-20 (2d Cir. 2005) (quoting *Picard v. O'Connor*, 404 U.S. 270, 275 (1971)).  Specifically, 28 U.S.C. § 2254 provides as follows:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant . . . .

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. §§ 2254(b) and (c).

Exhaustion requires that the prisoner "fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts." *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (citation omitted). Fair presentation includes petitioning for discretionary review in the state's highest appellate court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). However, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) (citation omitted). In such cases, the district court may deem the claims to be exhausted, but nevertheless procedurally barred from habeas review. *See Id.* at 140 (citing *Coleman*, 501 U.S. at 735.)

In New York, a defendant is permitted only one direct appeal. *See Jimenez*, 458 F.3d at 149. As discussed in Section II.A of this Opinion, *supra*, a defendant who fails to raise an issue on direct appeal, despite sufficient facts appearing in the record to do so, is barred under New York procedural rules from raising that issue in a collateral attack on his conviction. *See* New York State C.P.L. § 440.10(2)(c); *see also Sparks v. Burge*, 2012 WL 4479250, at *4 (S.D.N.Y. Sept. 28, 2012). In such circumstances, "a petitioner no longer has any available state court remedy, and the unexhausted claims are therefore deemed exhausted, but procedurally barred." *Read*, 2016 WL 165716, at *6.

As with claims barred on independent and adequate state grounds, a claimed deemed exhausted but procedurally defaulted still may be considered on habeas review if the petitioner can show "cause for the default and prejudice," or that he is "actually innocent of the crime for

which he was convicted." *Id.* (quoting *Carjaval v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)) (internal quotation marks omitted.)

### 1.      Claim 2, Alleging Prosecutorial Misconduct, Is Unexhausted but Barred

The Petition and Amended Petition allege prosecutorial misconduct on the ground that the prosecution knew Petitioner was not responsible for Douglas' murder.     In this regard, Petitioner's prosecutorial misconduct claim ties in with the alternate timeline theory he advances in support of his actual innocence argument.  Essentially, Petitioner contends that the prosecution knew that Douglas' murder must have occurred after 9:00 a.m., at which time Petitioner allegedly was returning to his apartment in Brooklyn.  Nevertheless, in violation of due process, the prosecution presented an earlier, fabricated timeline of the murder at trial, including through perjured testimony from Ms. Williams, knowing that it was false and that it destroyed Petitioner's alibi.  (*See* Pet. at 6, 23-26; Am. Pet. at 2-5.)

Petitioner did not raise that claim of prosecutorial misconduct on direct appeal.  He raised a similar, but distinct, claim in his § 440.10 motion, alleging prosecutorial misconduct on the grounds that the prosecution withheld exculpatory evidence and made improper comments during summation.  (*See* State Record, Pet.'s Aff. in Supp. of § 440.10 Mot., at 6-9, 26-27)  In its order denying the motion, the Queens County Supreme Court ruled that Petitioner's prosecutorial misconduct claim was procedurally defaulted because Petitioner could have, but did not, raise it on direct appeal.  (*See* State Record, Dec. & Order of Queens County Sup. Ct. dated Mar. 12, 2010, at 2.)   Accordingly, to the extent that ruling could be construed to encompass Petitioner's instant claim of prosecutorial misconduct, such claim is barred on independent and adequate state grounds.

Nevertheless, the Court views Petitioner's instant claim of prosecutorial misconduct as

distinct from the allegations he raised in his § 440.10 motion. It follows that Petitioner has not fairly presented the instant claim to the state courts, which ordinarily would warrant a finding that the claim is unexhausted. However, under the circumstances, it is appropriate to deem Petitioner's claim exhausted but procedurally barred from review by this Court, as he no longer has an available procedural vehicle to raise that claim in state court.[15] The order denying Petitioner's § 440.10 motion makes clear that the state court would find any such claim defaulted based upon Petitioner's failure to raise it on direct appeal. *See Morgan v. Lee*, 2012 WL 5336167, at *6 (W.D.N.Y. Oct. 26, 2012); *Williams v. Breslin*, 2008 WL 4179475, at *6 (E.D.N.Y. Sept. 9, 2008) ("Since petitioner failed to raise his claim of prosecutorial misconduct on direct appeal, the claim is procedurally defaulted.")

Furthermore, Petitioner fails to establish cause for his default. Again, he contends that his appellate counsel advised him against pursuing a claim of prosecutorial misconduct on direct appeal, but fails to establish that such advice was constitutionally deficient. (*See* Pet. at 7.) Finally, as established previously, Petitioner's actual innocence argument is unavailing and does not excuse his default. Accordingly, Petitioner's prosecutorial misconduct claim is unexhausted, but deemed exhausted and dismissed as procedurally barred.

## III. Merits Review of Petitioner's Remaining Claims

The Court identifies three claims subject to review on the merits. First, subject to an exception discussed below, Petitioner's claim of ineffective assistance of trial counsel is timely and adequately exhausted. Second, Petitioner's claims alleging *Miranda* violations are timely

---

[15] In connection with his prosecutorial misconduct claim, and generally throughout the Petition and Amended Petition, Petitioner also alleges that the prosecution elicited and relied on false testimony, including from Ms. Williams and Detective Cottage. (*See, e.g.*, Pet. at 23-26, 28-29.) Petitioner never raised such allegations of false testimony on direct appeal, even though all the facts necessary to do so appeared in the record. Accordingly, to the extent Petitioner's submissions can be construed to raise an independent claim of false testimony, such claim is unexhausted, but procedurally barred from review for the same reasons discussed above.

and adequately exhausted as well.  Finally, Petitioner's claim that the state court wrongfully denied his § 440.30 motion to compel DNA testing is assumed to be timely and exhausted.  For the reasons discussed below, each of these claims is dismissed on the merits.

## A.     Legal Standard

28 U.S.C. § 2254(a), as amended, provides as follows: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A federal district court may grant a writ of habeas corpus to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  An "unreasonable application" is one in which "the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case."  *Id.* at 413.  Finally, "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## B. Claim 1, Alleging Ineffective Assistance, Is Dismissed on the Merits

In the Petition, as supplemented by the Amended Petition, Petitioner alleges that his trial counsel was ineffective for failing to: (1) conduct an adequate investigation of the facts, particularly with respect to Ms. Prince and her purported observations on the day of Douglas' murder; (2) utilize Ms. Prince's testimony at trial, as well as documentary evidence like the DD-5 Report and 911 Sprint Sheet, to prove that Douglas was killed after 9:00 a.m.; (3) present and prove an alibi defense based on that same evidence; and (4) investigate and challenge Mr. Alejandro's allegations that Petitioner gave him the firearms recovered from his closet. (*See* Pet. at 5, 18-22; Am. Pet. at 1-2.) The first three grounds alleged, while stated variously, essentially all relate to the same overarching argument that counsel did not adequately investigate and present an alibi defense based on a timeline placing Douglas' murder after 9:00 a.m.

In connection with Petitioner's § 440.10 motion, the Queens County Supreme Court considered essentially the same arguments Petitioner raises here. Rejecting those arguments, the court found that affidavits from Ms. D'Elia and Mr. Kosinsnki "contradict[ed] the [Petitioner's] contentions and outline[d] trial strategies that were developed." (*See* State Record, Dec. & Order of Queens County Sup. Ct. dated Mar. 12, 2010, at 2.) Accordingly, the court determined that the representation Petitioner received from counsel was "meaningful," albeit unsuccessful, and that Petitioner's mere disagreement with counsel's tactics was insufficient to establish ineffective assistance. (*Id.* at 3.)

Under AEDPA's deferential standard of review, habeas relief is warranted only if the state court's conclusion "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). The relevant federal law

concerns the Sixth Amendment's guarantee that criminal defendants "shall enjoy the right . . . to have the Assistance of Counsel for [their] defense." U.S. Const. amend. VI. Importantly, "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). To prevail on an ineffective assistance claim, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness" measured by "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A "reasonable probability" of a different result is a "probability sufficient to undermine confidence in the outcome." *Id*. at 694.

"The burden of establishing both constitutionally deficient performance and prejudice is on the defendant." *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) (citing *Strickland*, 466 U.S. at 687). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Generally, "strategic choices made by counsel after a thorough investigation of the facts and law are 'virtually unchallengeable,' though strategic choices 'made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Thomas v. Kuhlman*, 255 F. Supp. 2d 99, 107 (E.D.N.Y. 2003) (quoting *Strickland*, 466 U.S. at 690-91).

Here, while the state court primarily applied state precedent in its order denying Petitioner's § 440.10 motion, the court did not reach a conclusion contrary to federal law. Furthermore, the court's ruling was grounded in a reasonable determination of the facts. As an initial matter, the record reflects that Petitioner's counsel undertook efforts to investigate the facts relevant to the timeline of the crime and any alibi defense that it might support. According

to Ms. D'Elia, she and Andrew Worgan ("Mr. Worgan"), her partner and co-counsel, reviewed Petitioner's cellphone records from the morning of Douglas' murder. Those records revealed that Petitioner was within blocks of Douglas' residence at 7:35 a.m., the approximate time when Douglas was killed according to the prosecution. (D'Elia Aff. ¶ 4b.) Mr. Worgan also hired an investigator to corroborate an alternate alibi offered by Petitioner, who claimed that he was playing basketball at a church at 7:30 a.m. (*Id.* ¶ 4c.) The investigator determined that the purported alibi was not possible. (*Id.*) Furthermore, Ms. D'Elia and Mr. Worgan reviewed statements taken by police, including the DD-5 Report containing Ms. Prince's observations on the morning of the murder. (*Id.* ¶ 4e.) While there is no indication that she interviewed Ms. Prince, Ms. D'Elia attested that she reviewed Ms. Prince's statements to police and determined that her testimony would "contradict and destroy" any alibi defense based on the argument that Douglas was killed after 9:00 a.m. (*Id.* ¶ 4d.)

Having reasonably determined that Petitioner's trial counsel conducted an adequate investigation of the facts, the state court did not misapply or contravene federal law in ruling that Petitioner's disagreement with counsel's tactics was insufficient to establish ineffective assistance. *See Williams*, 2008 WL 4179475, at *7 ("A petitioner cannot prevail under a theory of ineffective assistance merely because there is a disagreement over counsel's trial strategy."); *Singleton v. Duncan*, 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006); *Gluzman v. United States*, 124 F. Supp. 2d 171, 174 (S.D.N.Y. 2000) (citing *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir. 1991)). Similarly, the state court's ruling represented a reasonable determination of the facts. Indeed, while Petitioner contends that counsel failed to pursue an alibi defense, the record is to the contrary. In summation, Ms. D'Elia argued that police officers were not dispatched to Douglas' residence on a call of disturbance until almost 9:45 in the

morning. (Tr. 361.) She further argued that there was nothing to place Petitioner in the vicinity of Douglas' residence at that time. (Tr. 362.) Rather, based on Ms. Williams' testimony that Petitioner returned home between 9:00 and 10:00 a.m., it was "just as likely that [Petitioner] was home at the time of this alleged shooting." (*Id.*) Accordingly, in closing, Ms. D'Elia argued: "Your Honor, at the end of the day what it comes down to, there is nothing directly linking [Petitioner] to any murder. There is no time of death. His own wife establishes a possible alibi." (*Id.* 382.)

While the evidence presented at trial in support of an alibi defense was minimal, that simply was due to a lack of available evidence definitively establishing that Douglas was killed after 9:00 a.m. Petitioner contends that the necessary evidence would have been supplied by Ms. Prince's testimony. Nevertheless, Ms. D'Elia's decision not to call Ms. Prince at trial was a defensible tactical choice entitled to deference. *See United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (citing *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). As already noted, Ms. D'Elia determined based on Ms. Prince's statements to police that her testimony would have established a time of death earlier than 9:00 a.m. Mr. Kosinski independently came to the same conclusion. (Kosinski Aff. ¶ 14.) Furthermore, Mr. Kosinski investigated some of Ms. Prince's purported observations from the morning of Douglas' murder, and concluded that those observations physically could not have been made from her vantage point. (Kosinski Aff. ¶¶ 11-12.) Mr. Kosinski disclosed that information to Ms. D'Elia, who agreed not to call Ms. Prince at trial so long as the prosecution did not introduce the cellphone records establishing that Petitioner was within blocks of Douglas' residence at 7:35 a.m. (D'Elia Aff. ¶ 4e; Kosinski Aff. ¶¶ 8, 12.) While that effectively precluded the defense from relying on Ms. Prince's statements in the DD-5 Report

and 911 Sprint Sheet, it also allowed counsel to argue a later time of death without risking the introduction of cellphone records damning to Petitioner's alibi defense.

In passing, Petitioner also alleges instances where counsel should have conducted cross-examination differently. To the extent Petitioner raised those arguments in connection with his § 440.10 motion, the state court did not misapply or contravene federal law in rejecting them. It is well settled that "the conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and [a reviewing court] on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *Moreno-Godoy v. United States*, 2014 WL 1088300, at *24 (S.D.N.Y. Mar. 20, 2014) (quoting *Luciano*, 158 F.3d at 660). In any event, Petitioner relies only on speculation to suggest that certain questions or cross-examination tactics would have aided his defense. For example, Petitioner implausibly suggests that, if counsel had asked the testifying forensic biologist what time Douglas had died, she would have given a time of death consistent with Petitioner's alternate timeline. (*See* Pet. at 20.) In sum, the state court reached a conclusion entirely consistent with federal law when it ruled that Petitioner's disagreement with counsel's tactical choices did not establish constitutionally deficient performance. The fact that the state court did not conduct a prejudice analysis does not compel a different conclusion, as failing to establish just one of *Strickland's* prongs may warrant dismissal of an ineffective assistance claim, even without reaching the other prong. *See Palacios v. Burge*, 589 F.3d 556, 566 (2d Cir. 2009).

One aspect of Petitioner's ineffective assistance claim remains. He contends that counsel failed to investigate and subsequently challenge Mr. Alejandro's allegations that Petitioner gave him the firearms recovered from his closet. (*See* Pet. at 21-22.) This portion of Petitioner's ineffective assistance claim is unexhausted, as he never raised it to the state court in his § 440.10

motion or otherwise. Nevertheless, a court may "deny a petition on the merits as a matter of discretion, even if the petitioner pressed some unexhausted claims in his or her habeas petition." *Galdamez v. Keane*, 394 F. 3d 68, 71 (2d Cir. 2005); *see also* 28 U.S.C. § 2254(b)(2). Here, Petitioner fails to show that counsel's performance was constitutionally deficient. His only contention is that counsel, through adequate investigation, should have discovered that Petitioner was in custody on a separate charge from some point on February 15, 2003, the day after Douglas was killed, until February 21, 2003, and then immediately thereafter traveled to Florida. (*See* Pet. at 21-22.) According to Petitioner, this information could have been used to impeach statements Mr. Alejandro made to police indicating that Petitioner dropped off the firearms in question a "few days" after Douglas' murder. Even assuming that counsel never became aware of this information, Petitioner does not explain why that constituted a failure to investigate, and not a failure on his own part to inform counsel of information relevant to his defense.

Moreover, Petitioner cannot satisfy the prejudice prong of *Strickland*, as he fails to establish a reasonable probability that the outcome of trial would have been different had the defense presented such information. The prosecution's theory at trial was that Petitioner dropped off the firearms with Mr. Alejandro very early in the morning on February 15, 2003. The fact that Petitioner was taken into custody at some later time that day would not have undermined or rebutted the prosecution's theory. Moreover, Petitioner's entire argument seems to rest on inaccurate portrayals of the record. First, Petitioner contends that Mr. Alejandro's written statement to police indicates that the drop-off took place a "few days" after Douglas' murder. (*See* Pet. at 22.) Upon review, that is not what Mr. Alejandro's statement states. It states that Petitioner dropped off the guns a "few days" after allegedly visiting Mr. Alejandro earlier in the week to confide in him that "his best friend was out to kill him," and he needed "to defend

39

himself." (*See* Ex. C to the Pet.) Second, even assuming that the arrest records Petitioner submits are legitimate and accurate, they ostensibly indicate that he was arrested on February 16, 2003, not February 15. (*See* Ex. B to the Pet.) As such, even if evidence of Petitioner's arrest had been introduced at trial, there still would have been ample room for the prosecution to argue that Petitioner dropped off the firearms on February 15, or on the morning of February 16. In any event, the prosecution was not required to prove when those firearms were dropped off to sustain a conviction. In accordance with the foregoing, Petitioner's ineffective assistance claim is dismissed in its entirety.

### C.     Claims 5 and 6, Alleging *Miranda* Violations, Are Dismissed on the Merits

Petitioner alleges two related claims arising from his interrogation by police following his arrest on May 30, 2003. In the Petition and the Amended Petition, Petitioner appears to allege that he was never advised of his *Miranda* rights during interrogation. (*See* Pet. at 30-31; Am. Pet. at 6). Paradoxically, the Memorandum in Support alleges that Petitioner never understood the rights he was read, and that statements he made to police should have been suppressed because they were elicited in violation of his right to remain silent. (*See* Pet. Mem. at 11-12.) Given that Petitioner's claims directly contradict one another, the Court declines to construe the Petition and Amended Petition as alleging that police never administered *Miranda* warnings. Any such claim is belied by the record as well as Petitioner's own admissions. Instead, the Court construes Petitioner's claims as two sides of the same coin, alleging that detectives elicited statements from Petitioner after he had invoked his right to remain silent, and without re-administering *Miranda* warnings after a break in the interrogation.

Petitioner presented essentially that same claim to the state courts, initially by way of a pretrial motion to suppress. Following a *Huntley* hearing, the motion court denied Petitioner's

suppression motion and ruled that his inculpatory statements to police were admissible. In reaching that conclusion, the court found that detectives properly advised Petitioner of his *Miranda* rights. (*See* Dec. & Order of Queens Cnty. Sup Ct., dated Aug. 2, 2004, at 4.) While Petitioner did not verbally respond when asked if he understood each right, he otherwise evinced an understanding of those rights. (*Id.* at 5.) Moreover, the court found that Petitioner's statement that he was not going to speak "unless the District Attorney was [t]here" was insufficient to invoke his right to remain silent, as it was "equivocal" and demonstrated a "willingness to speak with a condition." (*Id.* at 4.) That statement similarly did not constitute an invocation of the right to counsel, as Petitioner only expressed a desire to speak with the district attorney. (*Id.* at 5-6.) Accordingly, the court concluded that Petitioner impliedly waived his rights when he subsequently answered questions from detectives. (*Id.* at 5.) Finally, the motion court found that the inculpatory statements Petitioner made when detectives showed him a photograph of the murder weapon were voluntary, as the detectives' actions were "not so egregious or deceptive so as to deny [Petitioner] of due process of law." (*Id.*) The Appellate Division subsequently affirmed the motion court's decision, holding in a cursory order that Petitioner did not "unequivocally invoke his right to remain silent after receiving *Miranda* warnings." *Williams*, 54 A.D.3d at 886.

Once again, habeas relief is warranted only if the state court's conclusion "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). The relevant principles of federal constitutional law were laid out in the Supreme Court's seminal decision in *Miranda v. Arizona*, 384 U.S. 436 (1996), which addressed the protections necessary to secure a suspect's Fifth Amendment right

against self-incrimination. As *Miranda* recognized, that right encapsulates the right to remain silent and the right to speak with an attorney. *Id.* at 444. Under *Miranda* and its progeny, the prosecution may not use statements made by a suspect under custodial interrogation unless: (1) the suspect has been apprised of such rights; and (2) the suspect knowingly, intelligently, and voluntarily waived those rights. *Id.* at 444-45. If the suspect, so informed, in any manner invokes his right to speak to an attorney, interrogation must stop. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Similarly, if the suspect invokes his right to remain silent, all questioning must cease and the custodial officers must "scrupulously honor[ ]" the suspect's right to silence. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

Here, Petitioner argues that the inculpatory statements he made to police should have been suppressed because, in stating that he would not speak unless the district attorney was there, he invoked his right to remain silent. The state court did not misapply federal law in rejecting that argument, nor did it premise its decision on an unreasonable determination of the facts. To begin with, the state court reasonably determined that Petitioner's statement was equivocal. The only condition Petitioner placed on his speech was that he wanted to talk with the district attorney, someone whom Petitioner had no constitutional right to speak with, and someone whose interests were aligned not with Petitioner's but with those of law enforcement. Far from expressing a desire not to speak, Petitioner communicated an absolute willingness to talk to the police as long as the right authority figure was present. The state court's determination that Petitioner was advised of his *Miranda* rights and adequately understood them similarly was reasonable. The record is clear that Detective Cottage read Petitioner his *Miranda* rights shortly after questioning began. While Petitioner mostly responded with a blank stare or smirk when asked if he understood, Petitioner never gave any indication that he did not understand his rights.

To the contrary, Petitioner's demand to speak to the district attorney and his subsequent request for a break evinced an understanding of the circumstances, and further demonstrated that Petitioner, when so moved, was perfectly capable of asserting his interests.

Based on the above findings, the state court did not misapply federal law in ruling that Petitioner's equivocal statement was insufficient to invoke his right to remain silent. In *Davis v. United States*, 512 U.S. 452, 459 (1994), the Supreme Court held that custodial officers are not required to cut off interrogation unless the suspect "unambiguously" invokes his right to counsel. The Supreme Court explained that a suspect's request, while it need not hew to some formalistic invocation of the right, must be "sufficiently clear[ ] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* After *Davis*, it was unclear whether the same principles applied in the context of the right to remain silent. The Supreme Court removed any lingering doubt in 2010, holding in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), that the standards articulated in *Davis* apply equally with respect to the right to remain silent. Accordingly, when ruling in 2004 that Petitioner's statements were admissible because he did not unambiguously invoke his right to silence, the state court did not contravene or misapply any clearly established federal law as determined by the Supreme Court.[16] Finally, given its determination that Petitioner was advised of his *Miranda* rights and did not invoke them except in equivocal terms, the state court did not misapply federal law in implicitly concluding that detectives were not required to re-administer a *Miranda* warning after

---

[16] At the time the state court made its decision, the law in the Second Circuit dictated that a custodial officer could only ask "clarifying questions" if a suspect ambiguously invoked the right to remain silent. *United States v. Ramirez*, 79 F.3d 293, 304 (2d Cir. 1996). That fact is immaterial here, as only Supreme Court precedent, and not Circuit precedent, constitutes "clearly established Federal law" under 28 U.SC. § 2254(d)(1.) In any event, *Ramirez* subsequently was overruled by implication by *Berghuis*.

a break in the interrogation.[17]  *See Bruno v. Cunningham*, 2004 WL 2290503, at *7 (S.D.N.Y. Oct. 8, 2004); *United States v. Mabi*e, 580 F. Supp. 1382, 1385 (E.D.N.Y. 1984).  Accordingly, Petitioner's claims of *Miranda* violations are dismissed.

### D.  Claim 10, Regarding the Denial of DNA Testing, Is Dismissed on the Merits

Petitioner's final claim is that the state court improperly denied his § 440.30 motion to compel DNA testing.  In its order of denial, the motion court found that Petitioner did not meet the state standard for post-conviction DNA testing in New York, which requires an applicant to establish a "reasonable probability that the verdict would have been more favorable" if the sought DNA evidence had been admitted at trial.  *See* § 440.30(1-a); *see also People v. Pitts*, 4 N.Y.3d 303, 311 (2005).  The motion court explained that extensive DNA analysis already had been conducted on several samples taken from the crime scene, revealing only traces of Douglas' own DNA.  (*Id.* at 2.)  Therefore, additional testing of Douglas' bloodied clothing was not warranted based on Petitioner's mere speculation that it could reveal the "true identity of the person who committed the crime."  (*Id.*)  The Appellate Division thereafter affirmed the motion court's decision, and leave to appeal subsequently was denied.

Petitioner's claim must be dismissed because it does not present any issue cognizable on habeas review.  It is well settled that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle*, 502 U.S. at 68.  For that reason, habeas review is limited to claims alleging violations of federal constitutional law.  *See Newton*, 2001 WL 799846, at *10; *see also* 28 U.S.C. § 2254(a) (habeas review is limited to claims that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United

---

[17]  On direct appeal, Petitioner's appellate counsel argued that failing to re-administer a *Miranda* warning following a break was contrary to the requirements articulated by the Supreme Court in *Michigan v. Mosley*.  While the Appellate Division did not expressly address counsel's argument in its brief affirmance, it properly rejected that argument.  *Mosley* is inapposite because it involved a situation where questioning was resumed after the suspect had, in the first instance, unequivocally invoked his right to remain silent.  *See Mosley*, 423 U.S. at 104-05.

States.")  Here, Petitioner's only claim is that the state court misapplied the standard for post-conviction DNA testing in New York.  As pleaded, that claim does not present an issue of federal constitutional law subject to this Court's review.  *See Green v. Walsh*, 2006 WL 2389306, at *20 (S.D.N.Y. Aug. 17, 2006) (petitioner's claim that state court erred in denying DNA testing was "based on a New York statutory right," and, therefore, was not "cognizable in [a] federal habeas proceeding."); *Venticinque v. Burge*, 2005 WL 3369093, at *5 (E.D.N.Y. Dec. 12, 2005); *Newton*, 2001 WL 799846, at *10-11; *Lyon v. Senkowski*, 109 F. Supp. 2d 125, 142 (W.D.N.Y. 2000).

Even if the Court were to liberally construe Petitioner's claim as raising a due process challenge, that claim still must be dismissed.  Any argument by Petitioner that he had a substantive due process right to obtain DNA evidence for purposes of proving his innocence is foreclosed by *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 72-74 (2009), where the Supreme Court unambiguously held that no such freestanding right exists.  *See also McKithen v. Brown*, 626 F.3d 143, 155 & n.7 (2d Cir. 2010) (acknowledging *Osborne's* substantive due process holding).  Petitioner's claim also would fail if construed as asserting that he is actually innocent and that DNA testing would prove it.  The Supreme Court has not yet recognized a standalone claim of actual innocence as a cognizable basis for federal habeas relief.[18]  *See McQuiggin,* 133 S. Ct. at 1931; *Herrera*, 506 U.S. at 400.  Accordingly, habeas relief is not warranted because Petitioner cannot show that the state court's denial of his § 440.30 motion was "contrary to, or involved an unreasonable application of, clearly established

---

[18]  In *Herrera*, the Supreme Court did not foreclose the possibility, at least in a capital case, that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  506 U.S. at 417.  That pronouncement is inapplicable here, as this is not a capital case.  Moreover, Petitioner has not established that, even with the benefit of further DNA testing, he could meet the "extraordinarily high" threshold to show proof of actual innocence sufficient to warrant federal habeas relief.  *Id.*; *see also Lyon*, 109 F. Supp. 2d at 142.

Federal law." 28 U.S. § 2254(d).

Finally, assuming that a procedural due process challenge can be inferred from Petitioner's claim, *Osborne* again is controlling to the extent that it limited the scope of such challenges. Consistent with *Osborne*, the relevant inquiry is whether Petitioner's claim, considered within the framework of New York's procedures for post-conviction relief, either "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation." *Osborne*, 557 U.S. at 69. Framed accordingly, Petitioner's claim is foreclosed because the Second Circuit has determined that the procedures for post-conviction DNA testing provided for under New York State C.P.L. § 440.30(1-a), pursuant to which Petitioner brought his state court motion, are sufficient to withstand a due process challenge. *See McKithen*, 626 F.3d at 153-54. Furthermore, even assuming that the Court had authority to review the state court's application of those procedures in Petitioner's particular case, the Court would not discern any procedural deprivation, let alone a deprivation that would rise to a due process violation. Accordingly, Petitioner's claim that the state court erred in denying his § 440.30 motion is dismissed.

## CONCLUSION

For the foregoing reasons, Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is dismissed in its entirety. Petitioner is denied a certificate of appealability, as he has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED

DATED:      Brooklyn, New York
              March 30, 2016


_____/s/_____
      DORA L. IRIZARRY
    United States District Judge